**F I L E D**
**Tenth Circuit**

PUBLISH

**September 12, 2006**

UNITED STATES COURT OF APPEALS

TENH CIRCUIT

---

WILLIAM E. SMITH, III; DENNIS L.
ALCON; ERIC ALCON; PAUL
ALCON; SIGFREDO ALCON; TONY
ALCON; DARRELL FREDERICK;
CHESTER TILEY; CARLOS
MONTANO,

     Plaintiffs-Appellants/Cross-
     Appellees,

v.

No. 04-2153 & 04-2168

AZTEC WELL SERVICING
COMPANY,

     Defendant-Appellee/Cross-
     Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CV-00-957-LH/RLP)**

---

E. Justin Pennington, Law Offices of E. Justin Pennington, Albuquerque, New
Mexico (Lisa K. Vigil, Vigil Law Firm, Albuquerque, New Mexico, and Shannon
L. Donahue, Shannon L. Donahue, P.C., with him on the briefs), for Plaintiffs-
Appellants/Cross-Appellees.

Robin A. Goble (Alice Tomlinson Lorenz with her on the briefs), of Miller
Stratvert P.A., Albuquerque, New Mexico, for Defendant-Appellee/Cross-
Appellant.

---

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**McCONNELL**, Circuit Judge.

**McCONNELL**, Circuit Judge.

Aztec Well Servicing Company ("Aztec") is a natural gas and oil well drilling company located in Aztec, New Mexico. The plaintiffs are present or former Aztec employees who worked on drilling rigs in the San Juan basin. They brought suit under the Fair Labor Standards Act ("FLSA"), claiming that their employer should be required to pay them for the time they spend traveling from Aztec to the drill sites – some of them in remote locations hours away. The plaintiffs later sought to add FLSA claims related to work performed at their job site, but the district court held that they were limited to their original travel-time claims. A jury found in favor of the plaintiffs on the travel-time claims, but the district court granted Aztec's motion for judgment as a matter of law. The court ruled that the plaintiffs' claims are barred by the Portal-to-Portal Act, which states that the FLSA does not require employers to compensate an employee for time spent "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a)(1). In this appeal, we address whether the district court acted within its discretion by limiting the plaintiffs to their travel-time claims and whether the district court correctly found that, as a matter of law, the Portal-to-Portal Act removed any obligation Aztec might otherwise have under the FLSA to compensate the plaintiffs for their travel time.

We **AFFIRM**.

## I. FACTS

**A. Pre-Trial Proceedings in the District Court**

On June 5, 2000, William E. Smith, III, a former Aztec rig worker, filed a complaint in New Mexico state court against Aztec, arguing that its policy of refusing to pay wages to drill rig crews for their travel time was a violation of the FLSA. Aztec removed the action to federal court and filed a motion to dismiss. Aztec argued that the plaintiff's claim for compensation under the FLSA for time spent traveling to and from his work site was barred by the Portal-to-Portal Act, 29 U.S.C. § 254(a). The district court denied Aztec's motion to dismiss.

After the district court denied Aztec's motion to dismiss, a number of other current and former Aztec rig workers consented to have Mr. Smith's attorney represent them in a joint action against Aztec for all unpaid wages owed under the FLSA. On October 23, 2001, the district court granted Mr. Smith's motion to certify his lawsuit as a class action.

The plaintiffs filed an amended complaint on January 18, 2002, asserting that Aztec owes "unpaid wages and overtime compensation due to [its] employees under the Fair Labor Standards Act." R. Vol. I at 31. To support their travel time claim, the plaintiffs made the following allegations: (1) "Aztec Well requires its twenty-four hour rig hands to meet at a designated location within the tri-city area

of Farmington - Aztec - Bloomfield prior to the commencement of each work shift"; (2) "The rig hands are further required to travel from this designated location to remote well sites . . . in a vehicle under the supervision and control of agents or employees of Aztec"; and (3) "During this travel to and from the well site, rig hands perform work . . . for which they are not compensated, nor is such travel time counted by Aztec Well towards hours worked by the rig hands, for purposes of calculating overtime pay." *Id.* at 34.

On February 15, 2002, the district court approved the plaintiffs' notice of pendency of class action, and the parties distributed the notice to other potential members of the class. The notice stated that "the Plaintiffs claim Aztec Well has failed to lawfully compensate its employees for all hours worked, including overtime, where . . . rig hands are not paid for travel time to and from well sites." *Id.* at 39. Subsequently, a number of Aztec employees opted into the lawsuit with respect to the travel-time claim.

In their answers to Aztec's interrogatories, the plaintiffs raised factual allegations that could support additional FLSA claims against Aztec based on pre- and post-shift work allegedly performed at the well sites. The interrogatory answers—which were not submitted to Aztec until October 11, 2002, several weeks after the close of discovery—contain the following allegations:

[O]n arrival at the well site, usually about 30 minutes before commencement of paid time, these plaintiffs would change into

-4-

specialized protective gear required by the employer . . . .  The crew would then meet sometimes with the tool pusher to discuss safety-related concerns. . . . Each crew member would then meet with his counterpart on the preceding crew . . ., and each would be briefed on the special concerns or considerations relevant to the performance of duties on that shift.  At that time the crew members would then commence their paid period.

*Id.* at 170–71.  Despite raising these allegations in their interrogatory answers, the plaintiffs made no attempt to include them in their pleadings by formally amending their complaint.

On November 4, 2002, Aztec filed a motion to dismiss several of the plaintiffs from the action because they had filed their notice of consent to representation after the statute of limitations on their FLSA claims had run. Actions for unpaid wages under the FLSA are "forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  The district court found that there was still a material question of fact as to the willfulness issue, and therefore dismissed only those plaintiffs who filed their consent to representation more than three years after leaving Aztec's employment.

At a subsequent hearing, on April 2, 2003, the district court granted Aztec's motion for partial summary judgment dismissing all travel-time claims that arose after January 27, 2000—the date when Aztec distributed a travel policy to its employees. Aztec's travel policy states "that it does not control or direct the travel or transportation of any 24-hour rig employee to or from the rig location," that no crew member "is required to travel to or from the 24-hour rig location with the [supervisor of the crew]," and that "24 hour crew members . . . may not be asked or required to perform any service or duty for the company or any company supervisor while traveling to or from the 24 hour location." R. Vol. I at 70 (emphasis omitted). The district court held that no reasonable jury could find for the plaintiffs on travel-time claims arising after this travel policy was announced, and ordered the plaintiffs to submit a revised list of the remaining class members in light of its ruling.

When the plaintiffs submitted their "revised" list of class members, they took the position that no one should be dismissed from the class pursuant to the district court's summary judgment order. The plaintiffs contended that the district court's order related only to their requests for travel-time compensation based on the nature of the traveling, not their travel-time claims based on "work activities performed by Plaintiffs during the travel period." R. Vol. I at 106, 107. The plaintiffs argued that because all of the class members were asserting both types of travel-time claims, they all remain parties to the action. Aztec contended

that the district court's previous order applied to both sets of travel-time claims, and therefore that any plaintiff who did not work for Aztec before January 27, 2000 should be dismissed from the action. Both parties appeared to agree that "[t]he only claim remaining in this litigation is the FLSA travel time claim." R. Vol. I at 95; *see also* R. Vol. I at 107–08 & n.1.

The district court agreed with Aztec's interpretation of its previous order, and dismissed thirty-four plaintiffs from the action who did not work for Aztec before January 27, 2000. Fifty-two plaintiffs remained in the action after the district court's order.

On December 10, 2003, the parties filed their pretrial order. Both parties stipulated to a number of facts in pretrial order, including the following: (1) "Aztec Well employed the Plaintiffs working on a '24 hour rig'"; (2) "the well sites on which Aztec Well performs its work vary in distance from the Aztec, New Mexico yard where Aztec Well's offices are located"; (3) "Aztec Well's 24-hour crew members are not paid for the time that they travel to and from well sites"; (4) there "is no contract . . . that required Aztec Well to compensate [plaintiffs] for time spent traveling"; (5) "it is the standard practice of other oilfield companies in the San Juan basin not to compensate 24-hour crew members for the time that they travel to and from a well site"; and (6) "[t]hree or four-person crews generally, but not always, drive together to well sites." R. Vol. I at 122.

The plaintiffs alleged in the pretrial order that they "regularly worked hours for which they were not compensated by Defendant, including required and necessary meetings, drive time, travel and other preliminary and postliminary activities which are an integral part of the Plaintiffs' principal activities." *Id*. at 120. In the section of the pretrial order containing the plaintiffs' factual contentions, the plaintiffs reasserted their claim from the October 2002 interrogatory answers that they performed work at the well sites before and after their shift. Aztec asserted that the plaintiffs' claim for relief "is barred in its entirety by the Portal-to-Portal Act, 29 U.S.C. § 254(a)." *Id*. at 121.

At the pretrial conference, ten days after the parties submitted their pretrial order, the district court heard arguments on whether the plaintiffs should be allowed to assert an FLSA claim against Aztec based on time allegedly spent changing into specialized clothing and attending pre-shift safety briefings. Aztec argued that these were "brand new claims" that have "not been in a complaint, an amended complaint, in a pretrial order, . . . [or] in any of the documents filed with the Court," and should be denied as untimely. *Id*. at 150-51. The plaintiffs argued that the claims were not new because they had been raised in the October 2002 interrogatory answers.

The district court agreed with Aztec, noting that the two additional claims would unduly complicate the case and weaken the commonalities of the class, and that the plaintiffs made no effort to amend their complaint to assert these two new

-8-

claims despite knowing about them for more than a year. Consequently, the court limited the plaintiffs' lawsuit against Aztec to the travel time claims asserted in their amended complaint.

**B. The Evidence Presented at Trial**

The trial began on February 18, 2004, and lasted four days. The central issue at trial was whether the time the plaintiffs spent traveling to and from the well sites before and after their shift constituted "work" within the meaning of the FLSA, which meant whether their traveling was an integral and indispensable part of the principal activities for which they were employed by Aztec. *See* 29 U.S.C. § 254(a). With respect to that question, the evidence presented by both parties was relatively consistent.

Aztec is a natural gas and oil well servicing company, hired by oil and gas companies to drill new wells and to service existing wells. When Aztec has been contracted to drill or service a well site, it provides the drilling rig along with the fuel, equipment, and personnel necessary for its operation. It employs a manager, known as the "tool pusher," to stay on site with the drilling rig while it is operational. The tool pusher oversees the other Aztec employees working at the well site and is responsible for transporting equipment and paperwork to and from the well site. The drilling rig itself is operated by a four-person crew, known as a "24-hour crew," which consists of a foreman, called the "driller," and three rig hands. Although the tool pusher has authority over the 24-hour crews working at

the rig, drillers are in charge of the three rig hands on their crew. Drillers have the authority to remove rig hands from their crew, but cannot fire them from their employment with Aztec.

The 24-hour crews work in eight-hour shifts at the rig, and commute back and forth to the well site each day. The crew members typically live in the "tri-city area" of Farmington, Bloomfield, and Aztec, and the well sites can be anywhere from thirty minutes to a three-and-a-half-hour drive from those towns.

Since Aztec first started its drilling operations in 1967, it has never paid crew members for their travel time to and from the well sites. According to Aztec's president and owner, Jerry Sandel, "their job starts at the rig site. How they get there is their own business." Trial Tr. 240. At trial, one of the plaintiffs stated, "[w]hen I was first hired, . . . . [Aztec] told me the fact that . . . the reason the wages were so much higher [for work at the 24-hour rigs] is because you don't get travel and you're limited to eight hours, seven days on, two days off." *Id.* at 577. Consistent with this policy, Aztec charges its oil and gas company clients the same drilling fees without regard to the time spent by its 24-hour crews commuting to and from the well sites—a practice that appears to be uniform among the drilling companies operating in the San Juan Basin area.

While Aztec does not require its 24-hour crews to drive together to and from the well sites as a matter of official policy, there are a number of reasons why the crews usually do so. First, the roads to the well sites are often

-10-

impassable without a four-wheel drive vehicle, and not all 24-hour crew members have such a vehicle. Second, most of the well sites are located 50 or more miles outside of the tri-city area, and Aztec will pay the costs of gas for only one vehicle for each shift worked by a 24-hour crew. Third, many well sites are located on gated private property, and crew members driving separately from their drillers would need to pick up the appropriate permits and gate keys from the Aztec office before driving out to the well sites. Fourth, the space available for parking at the well sites can be limited, and there were allegedly times when the tool pushers would prohibit the rig hands from driving to the well sites alone because there was not enough parking space for an additional vehicle. Fifth, the drillers were under pressure from Aztec to arrive on site with a full crew, and the best way for drillers to ensure that everyone on their crew arrived on time was to drive them all to the well site personally.

As a result of these pressures, at least one former Aztec driller and plaintiff, Paul Alcon, used to require his crew to drive with him to and from the well sites. Another former Aztec driller and plaintiff, Charlie Kaiser, testified that he allowed his crew members to drive themselves to the well sites until a tool pusher expressed concern over the amount of parking space available. Mr. Alcon and Mr. Kaiser both admitted that Aztec did not know about their practice of requiring crew members to drive with them. Two other drillers testified that they allowed their crews to drive to the well site on their own. Regardless of the

-11-

differing policies adopted by Aztec's various drillers, however, the rig hands almost always drove with their drillers to the well sites because it was more convenient and less expensive than driving alone.

Because of their carpooling arrangement, the 24-hour crews would meet before each shift at a time and location designated by the driller. Usually this was at the Sundial convenience store in Aztec. The meeting time depended on which shift the crew was working and how far the well site was from the Sundial. When the 24-hour crew arrived at the Sundial before their shift, they would load their personal safety equipment, including hard hats, gloves, steel toed boots, and a type of coverall clothing they called "greasers," into whichever vehicle that they were driving out to the well site. One of the rig hands would fill a cooler with water, which the crew would use for drinking water at the well site.[1] Some crew members would purchase food and drinks at the Sundial as well. The crew usually drove out in their driller's vehicle, and the driller usually did the driving, although sometimes one of the other rig hands would volunteer to drive, and a few of the crews rotated the driving among the four members. On rare occasion, drillers would be asked by a tool pusher to bring some paper work or equipment

---

[1]Jerry Lacy, Aztec's safety supervisor and senior drilling engineer, and Clarence Smith, an Aztec tool pusher, both testified that there was certified potable water provided for the 24-hour crews at each well site. Paul Alcon, a former Aztec driller and plaintiff, testified that the water provided on site was unsanitary, and that the crew members did not drink it.

out to the well site, but it was always as a favor to the tool pusher rather than as a regular part of their job.

Generally speaking, the crew members were free to spend their time as they wished during the commute to and from the well site. They could sleep, eat, read, listen to the radio or their own music, or discuss any subject of their choosing. The crew members occasionally had to help their driller change a flat tire, open and close access gates along the road, help push the vehicle out of the mud when it was stuck, or put chains on the vehicle's tires. But these tasks took only a small portion of their total travel time.

According to Aztec, the only thing it ever asked of its 24-hour crews while they were traveling back and forth from the well sites was to drive safely. On at least one occasion, a 24-hour crew got into an automobile accident on their way to a well site. The accident happened because all four of the crew members, including the driver, had fallen asleep in the vehicle. To prevent similar such accidents from occurring, Aztec's safety supervisor and senior drilling engineer, Jerry Lacy, told the 24-hour crews that at least one other person in addition to the driver should stay awake during the drive. According to Mr. Kaiser, a plaintiff and former Aztec driller, Mr. Lacy told his crew "that [they] ought to talk about little things like safety and this, that and the other to keep everybody awake." *Id.* at 593.

Most of the drillers apparently ignored this advice and still allowed their crews to sleep during the drive to and from the well sites. But one of the plaintiffs, Mr. Alcon, testified that he never let any of his crew members sleep while he was driving because he "didn't want to fall asleep on the wheel and . . . have an accident." Trial Tr. 364. Instead, he would talk about work-related matters with his crew because "that's what kept our eyes open." *Id.* at 429–30. He used these conversations to talk about "[s]afety and basically giving them the knowledge of what's going on out there [at the rig] and what to do and what not to do, what they did wrong the day before and how to correct it." *Id.* at 423. According to Mr. Alcon, he spent approximately 75% of the travel time out to the well site engaged in these conversations, and the entire time coming back from the rig. Consequently, Mr. Alcon estimated that he spent, on average, somewhere between three to six hours each day talking about safety with his crew while traveling.

None of the other plaintiffs claimed that they spent this much time talking about work while driving to and from the well sites. They all agreed, however, that crew members usually spent at least some of their travel time discussing work-related matters. New rig hands would often receive advice about how to handle themselves and the equipment out at the rig. The driller might also take time during the drive back from the well site to chastize or provide instructions to a crew member who did something wrong out on the rig during their previous

-14-

shift.  Also, some drillers would talk with their crew about safety or the work that needed to be done at the rig.  The plaintiffs testified that when the driller was lecturing them about a safety-related matter, they were required to listen.  One plaintiff estimated that these discussions typically lasted about ten minutes, and a witness for Aztec agreed with that assessment.

Two of the plaintiffs claimed at trial that they conducted a formal safety meeting while traveling, even though Aztec requires that those meetings take place at the well site.  When the 24-hour crews arrive at the well site each day, they are supposed to hold a "Job Hazard Analysis" meeting, where they "spend anywhere from five to fifteen minutes" talking about what work needs to be done over the next eight hours, the hazards involved in the job, and how to minimize or eliminate those hazards.  *Id*. at 563.  Mr. Alcon and Mr. Kaiser both testified that they usually held their safety meetings while driving to the well site so that they could start working on the rig immediately after arriving.[2]  Other plaintiffs testified that their drillers sometimes held the safety meetings while driving out to the rig, but that they were usually conducted at the well site.  Several of Aztec's

---

[2]At trial, Aztec disputed whether it was even possible for drillers to hold a Job Hazard Analysis meeting while traveling to the well site, since it is difficult to predict what work will need to be done before arriving at the well site and talking with the outgoing crew.  Additionally, the driller is required to fill out certain paperwork during the meeting, and that paperwork is kept at the well site. The plaintiffs argued that they could reasonably predict the type of work that would be required at the rig based on what was happening at the end of their previous shift, and that they could do the paperwork after arriving.

witnesses testified that the safety meetings were always conducted at the well site, and that even if there was no time at the beginning of the shift to hold the safety meeting, there were always slow points during the day when they could hold the meeting.

**C. Disposition of the Case in the District Court**

At the close of the plaintiffs' case, Aztec moved to dismiss the case for failure to provide a sufficient evidentiary basis upon which a reasonable jury could find for the plaintiffs. Aztec also asked the court to dismiss the plaintiffs' willfulness claim. The district court held under advisement the motion to dismiss the case, but granted the motion to dismiss the willfulness claim, ruling that "the plaintiffs have not established that the defendant knew or showed reckless disregard for the fact that its conduct was prohibited by the Fair Labor Standards Act, which is the requirement for willfulness." *Id.* at 694. As a result, the plaintiffs were all subject to the two-year statute of limitations applicable to non-willful violations of the FLSA. 29 U.S.C. § 255(a). Of the fifty-two plaintiffs in the class at the start of trial, only seven plaintiffs remained in the action when the defendants began presenting their case to the jury.

After the close of evidence, on February 20, 2004, Aztec renewed its motion to dismiss the plaintiffs' case, which the district court denied. The case went to the jury after closing arguments on February 23, 2004. The Special Verdict Form provided to the jury asked a single question: "DID DEFENDANT

-16-

AZTEC WELL SERVICING COMPANY VIOLATE THE FAIR LABOR STANDARDS ACT BY FAILING TO COMPENSATE THE PLAINTIFFS FOR THEIR TRAVEL TO AND FROM THEIR WORK SITES?" R. Vol. I at 217. The jury returned a verdict for the plaintiffs later that same day.

After the jury's verdict in favor of the plaintiffs, the district court issued a *sua sponte* order on March 30, 2004 ruling that the plaintiffs who were drillers for Aztec were not "similarly situated" to the plaintiffs who were rig hands, and therefore dismissed them from the action. *Id.* at 221–225. In the same order, the court informed the parties that it would decide the issue of liquidated damages based on the evidence presented at trial, and ordered the parties to submit briefs on the issue no later than April 23, 2004.

Aztec submitted a brief on the liquidated damages issue on April 23, 2004, arguing that the evidence at trial showed that any FLSA violation was a good faith mistake by Aztec. The plaintiffs failed to submit a brief on the issue of liquidated damages, although they had recently submitted a motion for reconsideration of the order dismissing the willfulness claim, which involves similar legal and factual issues. On May 11, 2004, the court found that liquidated damages should not be awarded because "[t]he evidence adduced at trial" showed that Aztec "made every attempt to comply with the law." R. Vol. I at 279. The court also noted that "the Plaintiffs' failure to comply with the Court's order to brief this issue was persuasive as well." *Id.*

-17-

Shortly thereafter, on May 24, 2004, the district court granted Aztec's motion for judgment as a matter of law on the plaintiffs' travel-time claim. The court found that there was no evidence "to establish that the travel time in and of itself was work for which [the plaintiffs] must be compensated." *Id.* at 292. The court also found that the plaintiffs' work-related activities while traveling were either preliminary and postliminary to the principal activity for which they are employed, or were *de minimis*, and hence were non-compensable. It concluded that "[t]he evidence at trial was therefore insufficient to support the jury's verdict." *Id.* at 297.

The plaintiffs filed a timely notice of appeal on June 23, 2004.

**D. The Appeal**

On appeal, the plaintiffs challenge the following six of the district court's rulings: (1) the order entering judgment as a matter of law in favor of Aztec following the jury's verdict; (2) the order dismissing the plaintiffs' travel-time claims that arose after Aztec promulgated its written travel policy on January 27, 2000; (3) the order granting Aztec's motion to limit the case to the plaintiffs' travel-time claims, and exclude their claims for pre- and post-shift work performed at the well sites; (4) the *sua sponte* order dismissing from the action those plaintiffs who were drillers for Aztec on the ground that they are not "similarly situated" to the rig hands; (5) the order directing a verdict in favor of Aztec on the issue of whether Aztec willfully violated the FLSA; and (6) the

order denying the plaintiffs' liquidated damages. Aztec filed a cross appeal, arguing that the district court erred in failing to instruct the jury that "a corporation was bound only by actions of managerial level employees taken within the course and scope of their employment." Appellee's Br. 53.

We need address only two of the plaintiffs' arguments: that the district court wrongfully limited their case to the travel-time claims before trial, and that the district court erred in granting judgment as a matter of law to Aztec after the jury verdict.

## II. DISCUSSION

### A. Pre- and Post-Shift Work Performed at the Well Sites

We must first decide whether the district court erred in limiting the plaintiffs' case to their travel-time claims. During the pretrial conference, the district court ruled that the plaintiffs could not seek to recover against Aztec for time allegedly spent in mandatory pre-shift safety meetings and changing into and out of their specialized safety gear because they failed to raise these issues until the pretrial order. The plaintiffs argue that these claims were properly pled in their amended complaint, and that because the district court applied a "heightened pleading standard" that "conflicts with the well-established and liberal notice pleading rule" of Federal Rule of Civil Procedure 8(a), its decision should be reversed. Appellants' Br. 38.

The plaintiffs argued that language in the amended complaint claiming that they are "entitled to be compensated from the time they met at the designated meeting place until their return to that meeting place," necessarily encompasses claims for pre- and post-shift work at the well sites. Appellant's Br. 36. This argument borders on frivolous. The amended complaint merely states that "Aztec Well requires its twenty-four hour rig hands to meet at a designated location within the tri-city area," where they "are further required to travel from this designated location to remote well sites and to return to the designated location in a [single] vehicle." R. Vol. I at 34. The complaint then alleges that Aztec violated the FLSA because "[d]uring this travel to and from the well site, rig hands perform work for Aztec Well for which they are not compensated, nor is such travel time counted by Aztec Well towards hours worked by rig hands." *Id*. Although courts must construe the pleadings "as to do substantial justice," Fed. R. Civ. P. 8(f), this "does not require the district court to fabricate a claim that a plaintiff has not spelled out in the complaint." 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1286 (3d ed. 2004). The amended complaint in this case is clear. The plaintiffs sought to recover unpaid wages for time spent at the designated meeting place in town and traveling to and from the well sites. The only reference to "work" is to work performed "[d]uring this travel to and from the well site." R. Vol. 34. There is nothing in the complaint

-20-

to support a claim based on time spent in pre-shift safety meetings at the well site or in changing into and out of specialized safety gear.

The plaintiffs argue that even if they failed to include these claims in their amended complaint, their interrogatory answers notified Aztec of the claims in October 2002, more than a year before trial. Although interrogatory answers can be "relevant to discerning the breadth of a complaint," *Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807, 811 (7th Cir. 1973), we typically expect plaintiffs to file a formal motion to amend their pleadings if they want to add an entirely new claim to their complaint. *Cf. Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) (noting that "normally a court need not grant leave to amend when a party fails to file a formal motion"). Yet the plaintiffs made no attempt to amend their complaint until submitting the pretrial order in December 2003, fourteen months after identifying the new claims in their interrogatory answers. During that fourteen-month period, both parties filed briefs indicating that the plaintiffs' only claim against Aztec was for unpaid wages related to their travel time, and the district court dismissed over a third of the plaintiffs from the action based solely on its conclusion that their travel-time claims had to be dismissed. The plaintiffs' contention that they effectively raised the pre- and post-shift work claims in their October 2002 interrogatory answers is inconsistent with the position they took for more than a year afterwards. They

-21-

cannot now argue that the October 2002 interrogatory answers expanded the scope of their pleadings.

When the plaintiffs finally raised the FLSA claims related to pre- and post-shift work at the well sites in the pretrial order, the district court acted within its discretion in refusing to allow the new claims. Because the pretrial order is the controlling document at trial, a plaintiff's "attempt to add a new claim to the pretrial order [is] the equivalent of asking leave to amend his complaint, and must be evaluated by the court under the standards set forth in Rule 15(a)." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). While Rule 15(a) provides that leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), if there has been undue delay on the part of the plaintiff in raising the claim, the district court may properly deny the motion as untimely. *See Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994). When determining whether a newly raised claim is untimely under Rule 15(a), "[t]his Circuit . . . focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'" *Minter*, 451 F.3d at 1206 (quoting *Frank v. U.S. West*, 3 F.3d 1357, 1365–66 (10th Cir. 1993)). The plaintiffs offer no explanation for their 14-month delay other than the dubious assertion that "[u]ntil the district court's ruling at the pre-trial conference, [they] had no idea an amendment was necessary." Appellants' Reply Br. 19. We therefore find that the

district court did not abuse its discretion by limiting the plaintiffs to the travel-time claims raised in their amended complaint.

**B. Time Spent Traveling To and From the Well Sites**

The FLSA typically requires employers to pay their employees for all time spent working on their behalf. *See United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1116 (10th Cir. 1999) (citing 29 U.S.C. §§ 206, 207). Congress has never defined the term "work," however, and the courts are thus left to determine on a case-by-case basis whether an employee's activities are compensable under the FLSA. *See IBP, Inc. v. Alvarez*, 126 S. Ct. 514, 518–19 (2005); *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 554–55 (10th Cir. 1958). Early Supreme Court decisions on the issue defined "work" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691–92 (1946). In both *Tennessee Coal* and *Anderson*, the Supreme Court held that time spent by employees walking or riding to their workstation from the mine or factory entrance was compensable under the FLSA. *Tenn. Coal*, 321 U.S. at 598; *Anderson*, 328 U.S. at 691.

In 1947, one year after the Supreme Court's decision in *Anderson*, Congress passed the Portal-to-Portal Act, 29 U.S.C. § 254, which amended the

FLSA to shield employers from "judicial interpretations of the FLSA [that] had superseded 'long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities." *Alvarez*, 126 S. Ct. at 519. The Portal-to-Portal Act provides that

> no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended . . ., on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . —
>
>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>>
>> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). Employers are therefore not required to compensate employees for time spent commuting between home and their workplace, or for any activities that are "preliminary to or postliminary to" their principal activities at work. *Id.*; *see also* 29 C.F.R. § 790.7(f) (explaining that "[e]xamples of walking, riding, or traveling which . . . would normally be considered [noncompensable] 'preliminary' or 'postliminary' activities" include "riding on buses between a town and an outlying mine or factory where the employee is

-24-

employed," and "riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted").

While the Portal-to-Portal Act clearly excludes normal home to work travel from the scope of the FLSA, *see* 29 C.F.R. § 785.35,[3] the Supreme Court has held that the "Act does not purport to change this Court's earlier descriptions of the term[] 'work.'" *Alvarez*, 126 S. Ct. at 520.  In *Steiner v. Mitchell*, 350 U.S. 247, 254 (1956), the Supreme Court found that Congress passed the Portal-to-Portal Act still intending for an employee's activities to fall "within the protection of the [Fair Labor Standards] Act if they are an integral part of and are essential to the principal activities of the employees."  The Court therefore held "that activities performed either before or after the regular work shift . . . are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." *Id*. at 256.  The Supreme Court recently clarified this

_____

[3]FLSA regulations interpreting the Portal-to-Portal Act do not require compensation for time spent in "ordinary home to work travel which is a normal incident of [the worker's] employment."  29 C.F.R. § 785.35.  Although the regulation uses the terms "ordinary travel" and "normal travel," this "does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute.  Instead, it represents a subjective standard, defined by what is usual within the confines of a particular employment relationship." *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir. 1999).  Consequently, even though the plaintiffs sometimes spent up to seven hours commuting each day, their travel is still "ordinary" and "normal" home to work travel if it "was a contemplated, normal occurrence under the employment contract." *Id*. at 273.

rule in *Alvarez*, explaining "that any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under § 4(a) of the Portal-to-Portal Act," and is thus compensable under the FLSA. *Alvarez*, 126 S. Ct. at 525.

Consistent with this ruling, the Portal-to-Portal Act "has been interpreted not to prohibit overtime compensation when active duties are performed during travel time." *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir. 1986). Such active duties include when employees for an oil and gas well servicing company "transport equipment without which well servicing could not be done," and are therefore "performing an activity which is so closely related to the work which they and other employees perform, that it must be considered an integral and indispensable part of their principal activities." *D A & S Oil Well Servicing*, 262 F.2d at 555. However, when the travel is "solely for the transportation of employees to and from their principal place of work, then . . . the drivers are 'riding, or traveling' within the exclusion of Section 4 of the Act." *Id*.

The plaintiffs contend that the district court erred in holding, as a matter of law, that "the Defendant did not violate the FLSA by failing to compensate the Plaintiffs for their travel to and from their work sites." R. Vol. I at 297. They argue that the evidence at trial provided the jury with two grounds upon which it could have reasonably reached its verdict: first, that their "travel to and from" the well sites "was an integral and indispensable part of their principal activity of

-26-

working oil and gas rigs at remote locations"; and second, that they were "required to perform work-related activities" while traveling that were "predominantly for the benefit of the[ir] employer." Appellants' Br. 28–29.

"[W]e review a judgment as a matter of law under the same standard regardless of whether the judgment is rendered before or after the jury renders its verdict." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996). Our review of the district court's order granting judgment as a matter of law is *de novo*. *See Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2001). We apply the same standard applied by the district court, and thus will "uphold a JML order only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found." *Weese*, 98 F.3d at 547 (internal quotation marks omitted).

**1. Travel Time**

The plaintiffs raise three arguments for why their travel to and from the well sites was integral and indispensable to their principal activities, and thus compensable under the FLSA. First, they argue that Aztec placed requirements on them during their travel—namely, that it required them to ride together with the other members of their crew—which made the Portal-to-Portal Act inapplicable to their travel-time claim. Second, they claim that their travel time was compensable because their workdays started and ended at the Sundial convenience store, where they were picked up and dropped off before and after

their shift. Third, they argue that their travel time was itself "work" within the meaning of the FLSA because they were required to transport equipment and paperwork necessary for Aztec's drilling operations while traveling to and from the well sites. We evaluate each argument in turn.

With respect to the plaintiffs' first contention, even if we assume that there was sufficient evidence to show that most drillers required their rig hands to travel with them to and from the well sites, and that Aztec knew or should have known about this practice, the district court correctly held that "[t]his alone is insufficient to support the jury's verdict." R. Vol. I at 292. Pursuant to the Portal-to-Portal Act, employers are not required to compensate their employees for time spent "traveling to and from" the place of their principal activities, and nothing in the statute indicates that there is a *per se* exception for employees just because they must travel with their co-workers. 29 U.S.C. § 254(a)(1). A restriction imposed on the manner in which the plaintiffs can travel to and from their workplace is relevant only if it shows that their travel time was integral and indispensable to their principal activities.

Consequently, unless the plaintiffs' travel was an integral and indispensable part of their principal activities *because* they were traveling together with their crew, then the alleged carpooling requirement does not transform the plaintiffs' travel time into compensable work hours. *See Alvarez*, 126 S. Ct. at 521; *Crenshaw*, 798 F.2d at 1350. If Aztec required its 24-hour crews to drive

-28-

together for the purpose of allowing them to conduct essential planning and preparation work needed for their job at the well site, then the travel time might well be integral and indispensable to their principal activities. As President Truman stated in the President's Message to Congress on Approval of the Portal-to-Portal Act, "I am sure the courts will not permit employers to use artificial devices such as the shifting of work to the beginning or end of the day to avoid liability under the law." *Bobo v. United States*, 37 Fed. Cl. 690, 698 (Fed. Cl. Ct. 1997) (quoting 93 Cong. Rec. 5418, 80th Cong., 1st Sess. (1947), *reprinted in* 1947 U.S.C.C.A.N. 1827-28). In this case, however, the plaintiffs allege that Aztec required them to travel together "because there was insufficient parking at the well sites" and it wanted "a full crew [present] . . . at the start of the job." Appellants' Br. 27. In other words, the plaintiffs were required to travel together for reasons related to the logistics of commuting rather than anything integral and indispensable to their principal activities. Additionally, the plaintiffs acknowledged that they would have traveled together even if their drillers did not require them to do so because it is more convenient than driving alone. Under these circumstances, even mandatory carpooling to and from the well sites is still "riding, or traveling" within the meaning of the Portal-to-Portal Act.

The plaintiffs' second argument for why their "travel time itself" should be "defined as compensable" is because they were "required to meet and perform some other work or get instructions before proceeding to their job site."

Appellants' Br. 26. The plaintiffs largely rely on one of the federal regulations interpreting the FLSA, 29 C.F.R. § 785.38, which states that,

> [w]here an employee is required to report at a meeting place to receive instructions or to perform other work there, . . . the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked . . . .

This regulation follows from the "whistle to whistle" rule, which provides that, "during a continuous workday, any walking[, riding, or traveling] time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of that provision, and as a result is covered by the FLSA." *Alvarez*, 126 S. Ct. at 525. If the plaintiffs' first principal activity took place at the Sundial convenience store before traveling to the well site, and their last principal activity took place at the Sundial after returning from the well site, then, under *Alvarez*, their travel time would be included within their workday.

Although the plaintiffs make a valiant attempt to characterize their activities at Sundial as integral and indispensable to their principal activities, their efforts are unavailing. There is no evidence that they received necessary instructions at the Sundial related to their work at the well site, which, according to 29 C.F.R. § 785.38, would trigger the start of the workday. *See Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994). Nor is there any evidence that Aztec regularly required the plaintiffs to pick up or drop off essential equipment or

paperwork while traveling, which could also constitute a "principal activity" within the meaning of the Portal-to-Portal Act. *See D A & S Oil Well Servicing*, 262 F.2d at 555.

The plaintiffs assert that their workday started at the Sundial because, after they arrived there, they were required to load their personal safety equipment—including their hard hats, gloves, steel-toed boots, and coverall clothing—into their driller's vehicle. This argument is foreclosed by our holding in *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 & n.1 (10th Cir. 1994), where we explained that when an employee's activity "takes all of a few seconds and requires little or no concentration," then the activity is "properly considered not work at all." Moreover, "[r]equiring employees to show up at their work stations with such standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no different from having a baseball player show up in uniform, . . . or a judge with a robe. It is simply a prerequisite for the job, and is purely preliminary in nature." *Id*. at 1125, 1126 n.1; *see also* 29 C.F.R. § 790.7(d). Consequently, the plaintiffs' travel to and from the well sites was not integral and indispensable to their principal activities merely because they were required to carry their personal safety equipment along with them.

Additionally, the plaintiffs assert that their workday started at the Sundial because they would often purchase food and drinks there, and because one crew member would fill a cooler with drinking water and load it into the vehicle.

Although these activities might be necessary in some sense, they are not "so closely related to the work which [the plaintiffs] and the other employees perform, that it must be considered an integral and indispensable part of their principal activities." *D A & S Oil Well Servicing*, 262 F.2d at 555. Buying snacks at the Sundial is no more part of the "work" than fixing a tuna sandwich to take for lunch. These activities are preliminary to or postliminary to the principal activities for which the plaintiffs are employed.

The plaintiffs' third argument for why their travel was "work" within the meaning of the FLSA is that they were allegedly required to transport essential tools and paperwork while traveling to and from the well sites. Our Circuit has previously held that "employees who transported equipment needed to service producing oil wells must be compensated for their travel time." *Crenshaw*, 798 F.2d at 1350. In the trial below, however, there was no evidence that the plaintiffs regularly transported such equipment as a part of their daily travel. Generally speaking, an activity is integral and indispensable to the principal activities only if "such work is necessary to the [employer's] business and . . . performed by the employees . . . in the ordinary course of that business." *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir. 1976) (Wisdom, J.). While the plaintiffs occasionally carried equipment and paperwork on behalf of the tool pusher, this was a relatively rare occurrence, and the crews did it as a favor to the tool pusher rather than as an ordinary part of their job. Because they did not

transport essential equipment or papers in the ordinary course of business, the few instances where they did transport such materials does not transform *all* of their travel time into an integral and indispensable part of their principal activities.

We therefore agree with the district court that "the Plaintiffs failed to establish that the travel time in and of itself was work for which they must be compensated." R. Vol. I at 292.

**2. Compensable Activities Performed While Traveling**

Even though the Portal-to-Portal Act shields Aztec from any obligation to compensate the plaintiffs for their travel, "it [does] not follow that the employer is exempt from payment for actual work required to be done during such travel." *Reich v. N.Y. City Transit Auth.*, 45 F.3d 646, 651 (2d Cir. 1995). As a general rule, an "employee is entitled to payment for any work that the employer requires the employee to perform during the commute." *Aiken v. City of Memphis*, 190 F.3d 753, 758 (6th Cir. 1999). The plaintiffs argue that they engaged in a number of compensable activities while traveling that, when considered in the aggregate, support the jury's verdict. *Id*.

Although the plaintiffs base this claim on their testimony about the various activities they performed during the commute, such as holding safety discussions and changing tires, their request for compensation is not limited to the time spent on those activities. The plaintiffs still seek compensation for their travel time. Indeed, the only question submitted to the jury was whether Aztec violated the

FLSA "by failing to compensate the plaintiffs for their travel to and from their work sites." R. Vol. I at 217 (emphasis omitted). The jury was not asked, and did not decide, whether Aztec could be required to compensate the plaintiffs for any time spent on the individual activities they allegedly performed during the commute. *Id.* We express no opinion on the viability of such a claim.

Instead, we must determine whether the plaintiffs can be compensated for the entirety of their travel time because of the actual work they performed during a portion of that time. "[T]he test for whether an employee's time constitutes working time is whether the time spent is spent predominantly for the employer's benefit or for the employee's." *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1116 (10th Cir. 1999) (internal quotation marks omitted) (alteration in original). If the employer requires work "during the major part of commuting time," then the "entire commute should be compensated." *N.Y. City Transit Auth.*, 45 F.3d at 651–52. We therefore ask whether a reasonable jury could have concluded that the plaintiffs spent the majority of their travel time—which was somewhere between one and seven hours round trip—engaged in actual work on behalf of Aztec.

The plaintiffs first point to the evidence at trial showing that, during their commute, they were required to engage in activities such as "digging trucks out of the mud and snow, changing tires, putting on chains, and opening and closing gates." Appellants' Reply Br. 10. All of these activities, however, are merely

incidental to the plaintiffs' travel to and from the well sites, and therefore fall within the portal-to-portal exclusion. As the Ninth Circuit explained in *Lindow v. United States*, 738 F.2d 1057, 1064 (9th Cir. 1984), "the Portal-to-Portal Act specifically exempted from the FLSA overtime requirements the time plaintiffs took to open and close the project gates" because the activity simply "enables the employees to reach their actual place of performance." Likewise, when the plaintiffs must change a flat tire, push the vehicle out of the mud, or put chains on the tires during the course of their commute, they are engaging in activities necessary to arrive at work. This is nothing more than what commuters would normally do if their vehicle encountered such exigencies. Those activities are therefore preliminary to or postliminary to the plaintiffs' principal activities at the well sites, and do not qualify as "work" under the FLSA.

Finally, the plaintiffs argue that their travel time was compensable because they spent the majority of it discussing matters essential to their work at the well site, including workplace safety, training new rig hands, planning for the work they expected to encounter that day, and criticizing or disciplining crew members who did something wrong during the previous shift. But there is no evidence that the plaintiffs spent the majority of their travel time engaged in these work-related conversations. Indeed, all but one of the plaintiffs acknowledged that the 24-hour crew members were generally free to spend their travel time as they wished: they could sleep, eat, read, listen to a portable radio, or discuss any subject of their

-35-

choosing. Moreover, based on the testimony at trial, it is apparent that the plaintiffs' predominant activity while traveling was sleeping.

The plaintiffs rely on the testimony of Mr. Alcon, a former driller and plaintiff, to argue that the jury could have reasonably found that they spent the majority of their travel time engaged in essential work-related conversations. Mr. Alcon testified that he would spend anywhere from 75% to 100% of his travel time talking about safety and other work-related matters, and never let his crew members fall asleep during the drive. Mr. Alcon also testified, however, that the reason he spent so much time lecturing his crew was because he "didn't want to fall asleep on the wheel and . . . have an accident," and the conversations were "what kept our eyes open." Trial Tr. 364, 429–30. In light of this testimony, no reasonable juror could have found that Mr. Alcon's lengthy talks about safety and training were integral and indispensable to the plaintiffs' principal activities at the well sites, rather than just a technique he used to stay awake while driving. If Plato were more interesting, they would have discussed the Theory of the Forms.

We therefore agree with the district court that none of the plaintiffs' activities while traveling to and from the well sites were sufficient to render their entire travel time compensable under the FLSA.

## III. CONCLUSION

The district court's order granting judgment as a matter of law to Aztec is

AFFIRMED.