Joél JOHNSON, Plaintiff,

v.

RGIS INVENTORY SPECIALISTS, Defendant.

Civil Action No. 1:05–CV–389.

United States District Court, E.D. Texas, Beaumont Division.

May 29, 2007.

Camilla L. Roberson and Guy B. Wallace, of Schneider & Wallace, San Francisco, CA, Peter Brian Schneider and William T. Jones, Jr. of Grady Schneider Newman LLP, Houston, TX, for Plaintiff.

Larry James Simmons, Jr. of Germer Gertz, Beaumont, TX, Cheryl D. Orr and Heather M. Sager of Drinker Biddle & Reath LLP, San Francisco, CA, for Defendant.

## MEMORANDUM AND ORDER

MARCIA A. CRONE, Judge.

Pending before the court is Defendant RGIS Inventory Specialists's ("RGIS") Motion for Summary Judgment (# 83). RGIS seeks summary judgment on Plaintiff Joél Johnson's ("Johnson") claims against RGIS for purported violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment should be granted in part and denied in part.

### I. *Background*

This lawsuit was filed on June 7, 2005, to challenge the compensation practices of RGIS and recover allegedly unpaid over-

time and minimum wages pursuant to the FLSA's collective action provision. *See* 29 U.S.C. § 216(b). RGIS is the nation's largest provider of inventory services to the retail industry, employing individuals to count and record merchandise for its customers. Johnson, on her own behalf and on behalf of others similarly situated, alleges that RGIS has engaged, and continues to engage, in a willful policy, pattern, or practice of denying its employees working as "auditors" full compensation for all hours worked.

On June 27, 2006, the court conditionally certified a class of non-exempt, hourly auditors working within District 166 during the three-year period prior to the filing of Johnson's lawsuit and authorized Johnson to send notice to said individuals.[1] Twenty-four opt-in plaintiffs consented to participate in this action. On March 23, 2007, however, the court decertified the class upon motion by RGIS because the class members were not sufficiently similar to each other or to Johnson to warrant collective treatment. Accordingly, the opt-in plaintiffs were dismissed without prejudice and Johnson proceeds on her individual claims against RGIS.

Johnson was employed by RGIS from December 18, 1996, until October 25, 2004, when RGIS terminated her employment. She was initially hired as an auditor, which is an hourly position held by employees trained in the use of RGIS equipment to count merchandise at retail stores. Auditors are entry-level employees who are supervised during an inventory by a team leader, area manager, district manager, or any combination thereof. Although Johnson was promoted to team leader approxi-

mately three months after she was hired, she requested to step down from that position and resumed her duties as an auditor on July 21, 2001.[2] Because the relevant time period in this case is from June 7, 2002, until Johnson's termination on October 25, 2004, only her experiences as an auditor are at issue.

Due to the diverse locations of RGIS's customers, the stores are categorized by the district manager as either "local stores" or "travel stores." While RGIS has no specific policy with regard to designating certain stores as local and others as travel, locations more than twenty miles from Beaumont are generally considered travel stores and those less than twenty miles from Beaumont are ordinarily deemed local stores. According to Johnson, approximately half of her inventories were completed at local stores and half were completed at travel stores. She acknowledged that this ratio was different for other employees and that some employees opted to work only at local stores. Johnson described working at travel stores within a one hour to two-and-one-half hour drive from Beaumont, in locations such as Lake Charles, Louisiana, Lufkin, Texas, and Houston, Texas.

Generally, auditors are expected to provide their own transportation directly to the job site when an inventory is scheduled at a local store. For travel stores, District 166 uses the Beaumont district office as a "meet site" and offers free transportation to and from the inventory. A meet site may also be designated for a local inventory if concerns such as limited parking, toll roads, or multi-store inventories in scattered locations pose a problem. As John-

---

1. District 166 of RGIS is based in Beaumont, Texas, but it serves customers with store locations throughout eastern Texas and western Louisiana.

2. Team leaders continue to perform audits but have the added responsibilities of setting schedules, loading and unloading equipment, transmitting inventory data to and from audit machines, and driving company-provided transportation.

son explained at deposition, when her schedule indicated a meet site was offered, she had the option of arriving at the meet site and riding in an RGIS van, arriving at the meet site and taking her own vehicle or riding in another auditor's vehicle, or notifying her supervisor that she wished to transport herself to the inventory directly rather than use the meet site. Johnson typically chose to utilize the meet site and company transportation.

If a meet site is designated, whether the inventory is at a local or travel store, RGIS's travel and commute policy applies. RGIS implemented two different travel and commute policies between 2002 and 2004, which compensated auditors for certain hours spent traveling to and from inventories. Prior to March 2004, RGIS paid for travel time if there was a meet site designated and the employee reported to the meet site.[3] The rate paid to auditors was based on a varying number of cents per mile, less twenty miles per round trip, or a minimum of $4.00 per hour, whichever rate was higher. After March 2004, however, RGIS modified its travel policy to pay auditors a flat rate of $5.15 per hour, minus the first hour of travel from the meet site to the inventory and the first hour of travel from the inventory back to the meet site. RGIS classified the two unpaid hours as noncompensable "commute time." In situations where an auditor worked at more than one store during a particular shift ("multi-store shift"), she continued to receive her inventory rate if the travel between job sites equaled one hour or less; if such travel exceeded one hour, the auditor received travel pay.

Additionally, RGIS management lists a "meet time" on auditors' schedules when a meet site is designated for an inventory. According to the RGIS Auditor's Handbook, the meet time represents the time that the company van is scheduled to leave the meet site. Thus, auditors are expected to arrive at the meet site promptly to enable the van to depart on schedule. Johnson alleges that the district manager, Ronald Eckerle ("Eckerle"), and area manager, Alecia Montgomery ("Montgomery"), frequently asked her to arrive at the meet site at least fifteen minutes prior to the scheduled meet time. Johnson contends that she complied with such requests but was not paid for arriving early. Rather, her travel pay commenced at the scheduled meet time.[4] Similarly, Johnson asserts that management asked her to arrive at least fifteen minutes early at local inventories but she was not paid until the time the inventory was scheduled to begin. Although RGIS disputes that Johnson was required to arrive early at inventories or

---

3. RGIS's corporate policy was to pay auditors only if they used the company transportation unless there was no space available in the van. District 166, however, paid all auditors who assembled at the meet site, regardless of whether they rode to the inventory in the company van. Under either pay scheme, auditors did not receive travel pay if they did not assemble at the meet site, with the exception of those instances where RGIS asked them to transport other auditors to the inventory in their private vehicles.

4. The court notes that Johnson provided inconsistent deposition testimony on this issue. She first claimed that she was not paid until the van actually left the meet site, stating that the time sheet listed the time that the van departed. Johnson then asserted that travel time was prerecorded on the time sheets because the supervisors generally knew the duration of travel to the various store locations. In any event, Johnson concedes in her recent Declaration of March 12, 2007, that she was "paid from the time that the transportation was *supposed* to leave a Meet site." Johnson Decl. ¶ 15 (emphasis added). This statement comports with testimony provided by area manager Montgomery that she began paying auditors as of the scheduled meet time, without regard to whether the van departed on schedule.

meet sites, it does not contest that travel pay commenced at the scheduled meet time and inventory pay commenced at the scheduled inventory start time or, in some cases, the actual start time if the inventory began ahead of schedule.

Johnson further alleges that she was not paid for tasks she completed in the van en route to the job site at the request of her supervisor. Specifically, Johnson claims that she would fill out paperwork, upload and download information between the audit machines and the portable computer, and verify that all of the required equipment was loaded into the van. She explained at deposition that such work occurred approximately once per month, when she inventoried delicatessens at various Wal–Mart locations. Team leader Doris Robertson ("Robertson") usually asked Johnson to perform this work, telling her that she did not have time to complete the tasks herself. Such duties were the responsibility of the team leader and were not part of Johnson's duties as an auditor. Johnson also contends that she helped load and unload equipment from the van and that supervisors occasionally held pre-inventory meetings, which are described below, in the company van while riding to travel stores.

Upon arrival at a job site, auditors must don special equipment in order to perform the inventory. Such equipment typically includes: (1) a belt and pouch that each auditor personally brings to the inventory; (2) a small portable computer, known as an Audit® or Audit Machine, which tracks the information from the inventory; (3) a laser gun used to scan bar codes that attaches to the Audit via a cable; (4) inventory tags to mark different areas of the store; and (5) a pen or other writing device. According to Johnson, she usually spent two to three minutes waiting in line to pick up her equipment in the store, twenty to thirty seconds putting on her belt, five seconds clipping the Audit to her belt, five seconds attaching the laser gun to the Audit, and one to two minutes turning on the Audit and waiting for the information to download.[5] Hence, it generally took Johnson approximately four to six minutes to gather, don, and prepare her equipment.

Once the auditors don their equipment, the inventory supervisor conducts a pre-inventory meeting. As described by district manager Eckerle, the supervisor generally thanks the auditors for coming to the inventory, reiterates that accuracy is RGIS's primary concern, and provides instructions unique to the specific inventory, such as describing the layout of the store and explaining which items should be counted. Johnson stated at deposition that these pre-inventory meetings lasted no longer than ten minutes and occurred after the scheduled inventory start time. She also acknowledged that she received inventory pay for such meetings, with the exception of those occasional meetings she alleges were conducted in the company van.

After an inventory has been completed, auditors transmit the data from their Audits to a hand-held computer at the site and then remove their equipment. Johnson maintains that the doffing process usually requires slightly more time than donning; however, she admitted at deposition that she received inventory pay while doffing her equipment. As auditors finish their work, they are free to sign out and leave the job site. Johnson cites this flexibility as a common reason why auditors opted to take private transportation to an

5. These numbers are a general estimate, with some variation depending on the circumstances. For example, in larger stores, the equipment was laid out in advance so that she and other auditors would not need to wait in line prior to donning equipment.

inventory rather than ride in the RGIS van. Because Johnson typically used the company transportation, however, she was unable to leave the store until the entire inventory was completed and the equipment was loaded into the van. Although Johnson stated at deposition that the team was usually paid their inventory rate until the van left the job site, she claimed that approximately twenty percent of the time—when Montgomery was supervising—she was signed out immediately after she finished and then waited off the clock for the rest of the team to complete the inventory. Johnson estimated that this wait time lasted an average of forty-five minutes, but she also noted that she was free to run errands or get food during that time.

In her First Amended Complaint, filed on October 18, 2005, Johnson alleges that RGIS willfully denied her full compensation in violation of the FLSA. Specifically, she alleges that both of RGIS's travel and commute policies fail to comply with the FLSA's minimum wage requirements and that she was denied compensation for inventory-related tasks she performed immediately prior to or during travel in RGIS-owned vehicles. She further contends that she was not properly compensated for "wait time," including time spent: (1) arriving early at a local or travel store and waiting for the inventory to commence; (2) arriving early at the meet site and waiting for company transportation to depart; and (3) waiting for company transportation to leave a travel store after she completed her inventory duties. Finally, Johnson claims that RGIS unlawfully denied her compensation for time spent donning and doffing her inventory equipment.

RGIS filed the instant motion for summary judgment on February 28, 2007, arguing that all of Johnson's claims fail as a matter of law. RGIS asserts that its travel and commute policies comply with federal law and compensate employees in excess of legal requirements. It further argues that the time spent by Johnson waiting or donning and doffing equipment is not compensable because it was preliminary or postliminary, rather than integral, to her principal job activity of counting store merchandise. Moreover, RGIS contends that these preliminary and postliminary activities are *de minimis* as a matter of law. Johnson responds that RGIS's travel and commute policies do not comply with the FLSA and that her time spent waiting and donning and doffing equipment was compensable work and is not *de minimis* as a matter of law. She also argues that genuine issues of material of fact preclude summary judgment in RGIS's favor.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir.2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlum-*

*berger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003).

"A fact is *'material'* if it *'might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *accord Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir.2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir.2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471; *Merritt–Campbell, Inc.*, 164 F.3d at 961.

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n. 3, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir.2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir.2003). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir.2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996); *see Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir.2003).

The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in her favor. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir.2004); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir.2003); *Martinez*, 338 F.3d at 411; *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir.2002). The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999); *accord Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).

Furthermore, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119

L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' " by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little,* 37 F.3d at 1075 (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348; *Hopper v. Frank,* 16 F.3d 92, 97 (5th Cir.1994); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1086 (5th Cir.1994)); *accord Warfield,* 436 F.3d at 557; *Boudreaux,* 402 F.3d at 540; *Wallace v. Texas Tech University,* 80 F.3d 1042, 1047 (5th Cir.1996). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown,* 337 F.3d at 541; *accord Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002); *see Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 332 (5th Cir.2004); *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir.2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *EMCASCO Ins. Co.,* 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.,* 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge,* 394 F.3d 311, 315

(5th Cir.2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

**B.  *The FLSA and the Portal–to–Portal Act***

"In 1938 Congress enacted the FLSA as a means of regulating minimum wages, maximum working hours, and child labor in industries that affected interstate commerce." *Reich v. Tiller Helicopter Servs., Inc.,* 8 F.3d 1018, 1024 (5th Cir.1993) (citing 29 U.S.C. § 202); *see also Rodriguez v. Township of Holiday Lakes,* 866 F.Supp. 1012, 1017 (S.D.Tex.1994) (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). The Act created minimum protections for individual workers to ensure that each employee would receive " " "[a] fair day's pay for a fair day's work" ' " and would be protected from 'the evil of "overwork" as well as "underpay." ' " *Barrentine v. Arkansas–Best Freight Sys., Inc. (Barrentine I),* 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (quoting *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 578, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) (quoting 81 CONG. REC. 4983 (1937) (message of President Roosevelt))). Accordingly, the FLSA establishes a minimum wage, regulations governing maximum hours, record-keeping and reporting requirements, provisions regulating child labor, and civil and criminal penalties for violation of any of its provisions. *Castillo v. Case Farms of Ohio, Inc.,* 96 F.Supp.2d 578, 636–37 (W.D.Tex.1999) (citing 29 U.S.C. §§ 201–219). Minimum wage and overtime requirements are the two central themes of the Act. *Cash v. Conn Appliances, Inc.,* 2 F.Supp.2d 884, 889–90 (E.D.Tex.1997) (quoting *Arnold v. Arkan-*

*sas,* 910 F.Supp. 1385, 1392 (E.D.Ark. 1995)).

In order to "clarify the duties of employers concerning compensating employees for incidental activities that constitute work but which occur before, after, or during the work shift," Congress passed the Portal–to–Portal Act in 1947. *Anderson v. Pilgrim's Pride Corp.,* 147 F.Supp.2d 556, 562 (E.D.Tex.2001), *aff'd,* 44 Fed.Appx. 652 (5th Cir.2002); *see* 29 U.S.C. § 254; *Dunlop v. City Elec., Inc.,* 527 F.2d 394, 397 (5th Cir.1976); *Karr v. City of Beaumont,* 950 F.Supp. 1317, 1322 (E.D.Tex.1997). The Portal–to–Portal Act provides, in relevant part:

> [N]o employer shall be subject to any liability or punishment under the [FLSA] . . . on account of the failure of such employer to pay an employee minimum wages, or . . . overtime compensation, for or on account of any of the following activities . . .
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

The legislative history and administrative interpretations of the Portal–to–Portal Act indicate that the phrase " 'activity or activities' was used to dispel the notion that any activities not inextricably tied to a single predominant principal activity could be considered noncompensable." *Dunlop,* 527 F.2d at 398. For purposes of the Portal–to–Portal Act, an employee may be

engaged in many principal activities, which include "any work of consequence performed for an employer, no matter when the work is performed." *Id.*; *accord Lindow v. United States,* 738 F.2d 1057, 1061 (9th Cir.1984) (quoting 29 C.F.R. § 790.8(a)). An activity is considered "principal" if it is " 'an integral and indispensable part of the principal activities for which [the employee is] employed' " and not specifically excluded by the Portal–to–Portal Act. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 30, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005) (quoting *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956)); *accord Bienkowski v. Northeastern Univ.,* 285 F.3d 138, 141 (1st Cir.2002); *Dunlop,* 527 F.2d at 399; *Pilgrim's Pride Corp.,* 147 F.Supp.2d at 562–63.

The United States Court of Appeals for the Fifth Circuit has held that the test to determine which activities are "integral and indispensable," and, thus, "principal," is "whether [the activities] are performed as part of the regular work of the employees in the ordinary course of business." *Dunlop,* 527 F.2d at 400–01; *accord Vega v. Gasper,* 36 F.3d 417, 424 (5th Cir.1994); *Karr,* 950 F.Supp. at 1322. "[W]hat is important is that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Dunlop,* 527 F.2d at 401; *accord Vega,* 36 F.3d at 424; *Karr,* 950 F.Supp. at 1322. "The only activities excluded from FLSA coverage [under the Portal–to–Portal Act] are those undertaken 'for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer.' " *Barrentine v. Arkansas–Best Freight Sys., Inc.* (*Barrentine II* ), 750 F.2d 47, 50 (8th Cir. 1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985) (quoting *Dunlop,* 527 F.2d at 398); *accord Mitchell v.*

*Southeastern Carbon Paper Co.*, 228 F.2d 934, 939 (5th Cir.1955).

## C. Travel Time

■ Johnson first contends that her travel time is compensable because travel was one of her principal activities as an auditor, rendering it compensable under the FLSA.[6] She further argues that she performed work prior to the departure of the company transportation from the meet site, namely, loading equipment into the van. Johnson claims, therefore, that the "continuous workday rule" requires compensation for the travel because it occurred after the start of the workday, which commenced with her work at the meet site. Finally, she asserts that RGIS had a custom and practice of paying for travel time, thereby negating any protections RGIS may be afforded under the Portal–to–Portal Act. RGIS responds that Johnson's principal activity was to count merchandise and that her travel to and from inventory sites was ordinary home-to-work travel that was not compensable. It also denies that Johnson performed any compensable work at the meet site, which was optional in nature, and disputes her contention that the workday commenced at the meet site. Finally, RGIS argues that its payment of a gratuitous travel stipend to its auditors cannot be transmuted into a statutory obligation.

### 1. Ordinary Home–to–Work Travel

The Wage and Hour Division of the United States Department of Labor has promulgated federal regulations relating to travel time, which expressly state that ordinary home-to-work travel is not considered worktime and is not compensable. 29 C.F.R. § 785.35; *accord Smith v. Aztec*

Well Servicing Co., 462 F.3d 1274, 1286 n. 3 (10th Cir.2006); *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir.1999); *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir.1998); *Vega*, 36 F.3d at 424.

> An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime.

29 C.F.R. § 785.35; *accord Smith*, 462 F.3d at 1286 n. 3; *Kavanagh*, 192 F.3d at 272; *Vega*, 36 F.3d at 424. The phrase, "normal travel," is not an objective standard of how far most workers commute or are reasonably expected to commute but rather "a subjective standard, defined by what is usual within the confines of a particular employment relationship." *Kavanagh*, 192 F.3d at 272; *accord Smith*, 462 F.3d at 1286 n. 3. Accordingly, home-to-work travel that is " 'a contemplated, normal occurrence' " of the employment is viewed as "normal travel" under the regulation. *Id.* (quoting *Kavanagh*, 192 F.3d at 273).

In contrast, "[t]ravel that is an indispensable part of performing one's job is a principal activity and is compensable." *Vega*, 36 F.3d at 424. As the Fifth Circuit explained in *Vega*:

> "Where an employee is required to report at a meeting place to receive instructions *or* to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted...." Travel be-

---

**6.** In her response to RGIS's motion, Johnson defines her principal activity as "appearing for and taking inventories." The court notes, however, that Johnson states in her Declara-

tion of March 12, 2007, that her "primary duty as an auditor was to measure and count merchandise at retail stores."

tween sites or from the last site to the office is compensable, but not travel from the last site home.

*Id.* (citation omitted) (emphasis in original) (quoting 29 C.F.R. § 785.38). Under the "continuous workday," or "whistle to whistle," rule, the workday is defined as " 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.' " *Alvarez*, 546 U.S. at 29, 126 S.Ct. 514 (quoting 29 C.F.R. § 790.6(b)). Consequently, when an employee is required to report to a designated meeting place to perform a principal activity, as described in the regulation, the start of the workday is triggered at the meeting place, and subsequent travel is "travel that is all in the day's work." 29 C.F.R. § 785.38; accord *Vega*, 36 F.3d at 425 (quoting *Dole v. Enduro Plumbing, Inc.*, No. 88–7041, 1990 WL 252270, at *5 (C.D.Cal. Oct. 16, 1990)).

A brief review of two cases presenting similar facts to the case at bar is instructive. For example, in *Vega*, seasonal farm workers sought to recover wages for time they spent traveling from a designated pickup point to the chili pepper fields in which they worked. *Id.* at 422–23. The workers furnished their own transportation from their homes to a pickup point in El Paso, Texas, where they would meet a bus that would transport them to the fields approximately two-and-one-half hours from El Paso. *Id.* at 423. During the bus ride, the workers were told which field they would pick that day and the applicable pay rate. *Id.* at 425. In holding that the travel was simply an extended home-to-work-and-back commute, the Fifth Circuit focused on the optional nature of the pickup point, which some workers chose not to utilize. *Id.* The court further emphasized that the workers performed no work prior to or while riding the bus and that the mere receipt of information regarding the field they would pick that day was insufficient to render the time com-

pensable. *Id.* (citing *Dolan v. Project Constr. Corp.*, 558 F.Supp. 1308, 1309–11 (D.Colo.1983); 29 C.F.R. § 785.38).

More recently, the Tenth Circuit reached a similar conclusion in *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir.2006). In *Smith*, the employer was a natural gas and oil well servicing company hired to drill new wells and to service existing wells. *Id.* at 1280. For each shift, a crew of workers would meet at a designated location and travel between thirty minutes and three-and-one-half hours to the well site. *Id.* Although carpooling to the well site was officially voluntary, the employer strongly encouraged its employees to ride together for logistical reasons, such as limited parking. *Id.* at 1280–81. Prior to departing the meet site, the workers would load their personal safety gear into the vehicle and occasionally bring along paperwork or other equipment as a favor to the tool pusher, who was stationed at the well site. *Id.* at 1281. The crew members usually spent at least some of their travel time discussing work-related matters, but they were generally free to use the time as they wished, often eating, reading, or sleeping. *Id.* Under the facts and evidence presented, the Tenth Circuit held that neither the travel itself, nor the loading of equipment and work-related discussions during transit, were integral and indispensable to the workers' principal activities but instead fell within the Portal–to–Portal Act, thus rendering the activities noncompensable. *Id.* at 1288–90.

In the instant case, the court concludes that, as a general matter, the travel time from the meet site to the inventory location and back was ordinary home-to-work-and-back travel and was not compensable. At the outset, it is undisputed that Johnson's use of the meet site and company transportation was entirely voluntary, as it

was in *Vega.*[7] Even if use of the transportation was strongly encouraged by RGIS, this was related to business and commuting logistics rather than the auditors' principal activities, as was the case in *Smith.* Several auditors opted not to use the transportation for a variety of reasons, such as a desire to smoke in their cars, listen to their own music, or leave the store immediately after they finished their duties. Had RGIS not offered company transportation, Johnson would have been responsible for transporting herself to the travel inventories, as is true for any other employee who must commute to work each day. Furthermore, extensive travel was "a contemplated, normal occurrence" of Johnson's employment at RGIS because she accepted the job with the understanding that she would be working in diverse store locations. *Kavanagh,* 192 F.3d at 273. The fact that a free commuting option was available to Johnson for certain inventories did not transform that commute into compensable work time.

Moreover, it is undisputed that Johnson was not required to report to the meet site to receive instructions, pick up and carry equipment, or perform other work. *See Smith,* 462 F.3d at 1289–90; *Vega,* 36 F.3d at 425; 29 C.F.R. § 785.38. Although Johnson claims that pre-inventory meetings were occasionally conducted in the RGIS van, there is no evidence that such instruction was ever given at the meet site. With regard to picking up and carrying equipment to the inventory, Johnson con-

cedes that she was not responsible for transporting the inventory equipment to and from the job site. Rather, such duties were assigned to the supervisor in charge of the inventory. While Johnson may have helped load or unload the equipment on certain days, she offers no evidence that this was a regular part of her duties before and after each shift.[8] Indeed, her FLSA claims for wait time include time she spent waiting for her supervisors to load and unload equipment, which she alleges took between five and ten minutes. Thus, the evidence presented by Johnson indisputably demonstrates that loading equipment was not integral and indispensable to her duties as an auditor. To the contrary, it was a principal activity of her supervisor, and the equipment would have been transported to and from the inventory location without regard to whether Johnson was at the meet site to help load it into the van. The fact that Johnson often rode in the van carrying the equipment is also irrelevant, as she was not obligated to do so in order to perform her auditor duties at the job site.

Because loading equipment was not one of Johnson's principal activities, the start of her workday was not triggered at the meet site. Unlike cases where an employee must report to a designated location to pick up a company vehicle or tools before traveling to a job site, Johnson was not required to report to the meet site at all, let alone for the purpose of receiving in-

---

7. Although Johnson disputes this fact in her response to RGIS's Statement of Undisputed Material Facts, there is no evidence that assembling at the meet site was required. Indeed, by Johnson's own admission at deposition, she had the option of traveling directly to the inventory rather than using the meet site—an alternative she selected on occasion. The optional nature of meet sites is further confirmed by RGIS's Auditor's Handbook and the testimony of several current and former RGIS auditors.

8. Even if such loading was considered compensable work under the FLSA, Johnson does not dispute the evidence presented by RGIS that she was, in fact, compensated for any loading that she performed. In particular, Montgomery testified at deposition that she typically handled the loading herself, as it was her responsibility, but that when auditors helped her load equipment she added the appropriate number of minutes to their inventory shift.

structions or loading and carrying necessary equipment. *See Burton v. Hillsborough County*, 181 Fed.Appx. 829, 834–35 (11th Cir.), *cert. denied*, —— U.S. ——, 127 S.Ct. 556, 166 L.Ed.2d 410 (2006) (holding travel time compensable where county workers were required to report to a county-owned site each day to pick up vehicles loaded with necessary equipment); *Dole*, 1990 WL 252270, at *5–6 (awarding compensation to plumbers required to report to the shop to load tools prior to traveling to the job site). In the case at bar, Johnson's home-to-work commute was not interrupted by any requirement imposed by RGIS to report to the meet site or perform necessary work there. It is also uncontested that auditors who rode in the company van ordinarily performed no work during the commute but rather slept, read, or talked with other auditors. Therefore, as a general matter, Johnson's travel time from the meet site to the inventory and back was ordinary home-to-work-and-back travel, which was not work time and not compensable under the FLSA.

### 2. *Custom and Practice of Paying for Travel Time*

■ Johnson next contends that RGIS is not relieved from liability under the Portal–to–Portal Act because it had a custom and practice of paying for travel time. In particular, she focuses on RGIS's current travel and commute policy, which became effective in March 2004. Under this policy, RGIS excludes the first hour of travel from the meet site to the inventory and the first hour of travel back to the meet site as unpaid "commute time." Johnson argues that because it was RGIS's custom and practice during her employment to pay for some of her travel time, all of her travel time had to be counted as hours worked and then compensated in accordance with minimum wage and overtime requirements. Hence, Johnson claims that she was improperly denied compensation for two hours of travel time per shift after March 2004.

Pursuant to § 254(b) of the Portal–to–Portal Act, an employer is not relieved from liability under § 254(a) if the activity at issue is compensable by "a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity." 29 U.S.C. § 254(b). The phrase, "custom or practice," is "descriptive generally of those situations where an employer, without being compelled to do so by an express provision of a contract, has paid employees for certain activities performed." 29 C.F.R. § 790.10(c); *accord United Paperworkers Int'l Union, Local No. 30192 v. Riverside Cement Co.*, 56 F.3d 73, 1995 WL 330636, at *3 (9th Cir. June 2, 1995) (unpublished decision). In the instant case, RGIS paid its auditors for a large portion of their travel time during the entire statutory period at issue without being compelled to do so under the FLSA or by contract. Consequently, it appears that RGIS had a custom or practice of paying for certain travel time during Johnson's tenure.

Nevertheless, Johnson's argument that RGIS is thereby prohibited from excluding any travel time from payment is without merit. Section 254(c) of the Portal–to–Portal Act states that an activity covered by a custom or practice of compensation is compensable "only when it is engaged in during the portion of the day with respect to which it is so made compensable." 29 U.S.C. § 254(c); *see* 29 C.F.R. § 785.9 (explaining the limitations of the custom or practice exception). Additionally, the regulations explain that only the amount of time allowed under the custom or practice of the employer is counted as hours worked. *Id.* (noting that "[i]f, for example,

the time allowed is 15 minutes but the activity takes 25 minutes, the time to be added to other working time would be limited to 15 minutes"). Hence, it is clear that the employer maintains the discretion to determine the limits of its custom or practice, thus making it permissible for RGIS to designate two hours of travel as unpaid commute time.

Moreover, the fact that RGIS compensated employees at a reduced rate for all travel time prior to the current policy is immaterial. The applicable custom or practice must be in effect "at the time of such activity" for it to fall within the exception. 29 U.S.C. § 254(b)(2); *see* 29 C.F.R. § 790.11. "Thus, the compensability of such an activity, and its inclusion in computation of hours worked, is not determinable by a custom or practice which had been terminated before the activity was engaged in or was adopted some time after the activity was performed." *Id.* The regulations also interpret this requirement to "permit recognition of changes in customs, practices and agreements which reflect changes in labor-management relations or policies." *Id.* Therefore, RGIS's decision to compensate its auditors for travel time prior to March 2004 did not bind RGIS to follow such a policy permanently. Accordingly, the court rejects Johnson's contention that she was entitled to compensation for all of her travel time because RGIS had a custom or practice of paying for travel under certain circumstances.

As an additional matter, the court considers the extent to which Johnson's compensated travel should be counted as hours worked. Section 254(d) of the Portal–to–Portal Act states that, in applying the minimum wage and overtime laws of the FLSA, "there shall be counted all that time, but only that time, during which the employee engages in any such activity which is compensable" by a custom or practice of the employer. 29 U.S.C.

§ 254(d). Section 790.5 of the regulations further explains the effect of the Portal–to–Portal Act on determining hours worked:

If time spent in such an activity would be time worked within the meaning of the Fair Labor Standards Act if the Portal Act had not been enacted, then the question whether it is to be included or excluded in computing hours worked under the law ... depends on the compensability of the activity under the relevant contract, custom, or practice applicable to the employment.... But where, apart from the Portal Act, time spent in such an activity would not be time worked within the meaning of the Fair Labor Standards Act, although made compensable by contract, custom, or practice, such compensability will not make it time worked under section 4(d) of the Portal Act.

29 C.F.R. § 790.5(a); *accord Id.* § 790.7 (reiterating that, even where there is a custom or practice of paying for a particular activity, § 254(d) of the Portal–to–Portal Act does not convert such time into hours worked under the FLSA if it would not be so counted under the FLSA alone).

■ A review of the applicable regulations and case law on this issue leads the court to conclude that, because the travel at issue in this case was ordinary home-to-work travel, such travel did not qualify as hours worked, even if RGIS had a custom or practice of paying for it. Specifically, the regulations acknowledge the distinction between ordinary home-to-work travel and other types of travel, such as an underground miner traveling from the portal of the mine to the working face of the mine at the beginning and end of each workday. *See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944); 29 C.F.R. § 785.34; *id.* § 790.5(b). Taking the latter

situation as an example, such travel was considered hours worked under the FLSA prior to the enactment of the Portal–to–Portal Act in 1947. *See Tennessee Coal, Iron & R. Co.,* 321 U.S. at 598, 64 S.Ct. 698. After the Portal–to–Portal Act's enactment, however, this travel was excluded from FLSA requirements unless a contract, custom, or practice was in place to compensate the employee for the travel time. *See* 29 U.S.C. § 254; 29 C.F.R. § 790.5(b).

In contrast, ordinary home-to-work travel was not viewed as hours worked, even prior to the enactment of the Portal–to–Portal Act. *See, e.g., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 691, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (citing *Walling v. Peavy–Wilson Lumber Co.,* 49 F.Supp. 846, 885 (W.D.La.1943); *Dollar v. Caddo River Lumber Co.,* 43 F.Supp. 822, 823 (W.D.Ark.1941)); *Tennessee Coal, Iron & R. Co.,* 321 U.S. at 599, 64 S.Ct. 698 (citing *Walling,* 49 F.Supp. at 885; *Bulot v. Freeport Sulphur Co.,* 45 F.Supp. 380, 381 (E.D.La.1942); *Sirmon v. Cron & Gracey Drilling Corp.,* 44 F.Supp. 29, 31 (W.D.La.1942); *Dollar,* 43 F.Supp. at 823). This interpretation of § 254(d) also comports with § 785.34 of the regulations, which states as follows:

> If compensable by express contract or by custom or practice not inconsistent with an express contract, such travel-time must be counted in computing hours worked. However, ordinary travel from home to work (see § 785.35) need not be counted as hours worked *even if the employer agrees to pay for it.*

29 C.F.R. § 785.34 (emphasis added). Accordingly, Johnson's travel time shall not be included in computing her hours worked for minimum wage and overtime purposes, even if RGIS is found to have had a custom or practice of compensating her for that time.[9]

### 3. *Minimum Wage Violations*

■ Although the court has determined that RGIS was not required under the FLSA to compensate Johnson for her travel time to and from the inventory sites generally, or to count such travel as hours worked, Johnson maintains that she sometimes performed work while traveling. Specifically, she alleges that she performed tasks on behalf of the team leader once per month and that supervisors occasionally conducted pre-inventory meetings en route to the inventory rather than at the inventory location. Moreover, when Johnson worked a multi-store shift, all of her travel time between job sites should have been compensated as travel that was all in the day's work. *See id.* § 785.38. Because RGIS opted to compensate its employees for some of their travel time in excess of the legal requirements, the court evaluates whether Johnson can maintain a viable claim for minimum wage violations.

Johnson claims that she completed tasks in the company van en route to the job site, such as filling out paperwork, uploading and downloading information from the portable computers, and verifying the presence of equipment, all of which were duties of the supervisor. She performed such work approximately once per month at the request of team leader Robertson. Typically, this work lasted approximately fifteen to thirty minutes. With regard to pre-inventory meetings, Johnson states in her Declaration of March 12, 2007, that supervisors sometimes held pre-inventory meetings in the company van rather than at the store, although Johnson does not dispute that such meetings were usually

---

**9.** This finding does not apply to any travel time during which Johnson performed compensable work, such as team leader tasks, or any travel that occurred during the workday proper under the continuous workday rule.

held in the store after the inventory start time.[10] RGIS responds that any work Johnson performed in the van was not compensable because it was not part of her job as an auditor and was performed voluntarily. It further denies that pre-inventory meetings took place outside of the store and that, in any event, such an activity was preliminary to Johnson's principal activities as an auditor and not compensable.

◾ Because team leader tasks were not Johnson's responsibility as an auditor, the court agrees with RGIS that such work was not part of Johnson's principal activities. Nevertheless, "[a]ny work which an employee is required to perform while traveling must, of course, be counted as hours worked." *Id.* § 785.41; *accord Smith*, 462 F.3d at 1290; *Aiken v. City of Memphis*, 190 F.3d 753, 758 (6th Cir.1999), *cert. denied*, 528 U.S. 1157, 120 S.Ct. 1164, 145 L.Ed.2d 1075 (2000); *Reich v. New York City Transit Auth.*, 45 F.3d 646, 651 (2d Cir.1995). While RGIS focuses on Johnson's admission that she did not mind performing these tasks, the court finds the voluntariness of her work irrelevant. When an employer knows or has reason to believe that an employee is working for the employer's benefit, the time spent by the employee is work time, even if the work was not requested. 29 C.F.R. § 785.11; *accord Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir.2001). The case at bar exceeds the circumstances contemplated by § 785.11 in that this work was, in fact, requested— Johnson did not volunteer for these tasks but performed them at the request of her supervisor, who did not complete the work herself. RGIS "cannot sit back and accept the benefits without compensating for them." 29 C.F.R. § 785.13; *accord Unit-*ed States Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 779–80 (6th Cir.1995).

With regard to pre-inventory meetings, the court finds that Johnson has raised a genuine issue of material fact as to whether attending pre-inventory meetings was integral and indispensable to her work as an auditor and, thus, a principal activity. To the extent that a jury finds that attending pre-inventory meetings was one of Johnson's principal activities and that such meetings were, in fact, conducted in the company van, she may be due compensation for that time. Additionally, if attending pre-inventory meetings was a principal activity, then the continuous workday rule dictates that Johnson's workday commenced at the time those meetings took place, and all subsequent travel should be counted as hours worked. Notwithstanding the potential compensability of the above activities, Johnson cannot pursue her claim for minimum wage violations if she was already compensated for the work through RGIS's travel and commute policies.

a. *Travel and Commute Policy Prior to March 2004*

◾ Prior to March 2004, auditors were compensated for travel time if they assembled at the meet site prior to the inventory. The rate was based on a varying number of cents per mile, less twenty miles per round trip, or a minimum of $4.00 per hour, whichever rate was higher. The travel hours were then added to the inventory hours and divided by the total nonovertime pay earned to equal a blended rate. In the event that the blended rate fell below minimum wage, RGIS's computer automatically added compensation to ensure that at least minimum wage was paid per hour. Johnson argues that this

---

10. Because Johnson was not specifically asked about pre-inventory meetings conducted during travel time at her deposition, her declaration does not conflict with her prior testimony on this point.

policy violated federal minimum wage law by compensating her at a rate of less than $5.15 per hour. Specifically, Johnson contends that § 206(a) of the FLSA requires hour-by-hour compliance in that each hourly rate paid must equal at least minimum wage. The court rejects this argument.

"While the minimum wage laws logically could be construed as requiring hour-by-hour compliance, both administrative and judicial decisions established the workweek as the measuring rod for compliance at a very early date." *Dove v. Coupe,* 759 F.2d 167, 171 (D.C.Cir.1985) (citation omitted). As explained by the United States Court of Appeals for the Second Circuit:

> The Congressional purpose underlying [§ 206(a) ] was to guarantee a minimum livelihood to the employees covered by the Act. Payment at intervals shorter than weekly is unusual and is not necessary to enable the employees to meet their customary obligations. Accordingly the Congressional purpose is accomplished so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.

*United States v. Klinghoffer Bros. Realty Corp.,* 285 F.2d 487, 490 (2d Cir.1960); *accord Cole Enters., Inc.,* 62 F.3d at 780; *Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir.1986); *Dove,* 759 F.2d at 171–72; *Blankenship v. Thurston Motor Lines, Inc.,* 415 F.2d 1193, 1198 (4th Cir.1969); *Cuevas v. Monroe St. City Club, Inc.,* 752 F.Supp. 1405, 1416 (N.D.Ill.1990).

Johnson contends that the above cases are inapplicable because they involved compensation schemes different from the one at issue here. The court, however, is not persuaded that differences in pay schemes are material. In concluding that the workweek, rather than the hour, is the appropriate measuring rod for minimum wage compliance, the courts were concerned with Congress's purpose in establishing and enforcing a minimum wage and found that such goals were adequately addressed by workweek compliance. *See Dove,* 759 F.2d at 171–72; *Klinghoffer Bros. Realty Corp.,* 285 F.2d at 490. Furthermore, expressing the minimum wage as an hourly rate in the statute allows for easy application to the variety of compensation plans implemented by employers, which often do not involve simple hourly rates. Thus, the court will not depart from the long line of cases holding that the workweek is the proper standard for determining compliance with minimum wage requirements.

Here, it is undisputed that RGIS's policy was to adjust Johnson's wages automatically if her blended rate of pay fell below minimum wage, and Johnson has not claimed or offered any evidence that she was not paid at least minimum wage for such time in any given workweek. Indeed, Johnson was likely paid well in excess of minimum wage because her inventory rates were $9.25 per hour from June 2002 through October 2003 and $9.75 per hour from November 2003 through March 2004. Therefore, based on RGIS's travel and commute policy prior to March 2004, the court concludes that Johnson's claim for minimum wage violations as to work she performed while traveling and as to travel that occurred between job sites fails as a matter of law.

b. *Travel and Commute Policy After March 2004*

Similar to its previous travel policy, RGIS paid for travel time after March 2004 if a meet site was designated and the employee reported to the meet site. Under the new policy, however, RGIS paid a

flat rate of $5.15 per hour, minus the first hour of travel from the meet site to the inventory and the first hour of travel from the inventory back to the meet site. Thus, if a travel store was located two hours from the meet site, yielding a total travel time of four hours, the auditor was paid for two hours of travel time at $5.15 per hour. In the case of a multi-store shift, if the travel between job sites equaled one hour or less, the auditor continued to receive her inventory rate; if such travel exceeded one hour, the auditor received travel pay.

Because Johnson fails to offer evidence that she was not paid at least the federal minimum wage of $5.15 per hour for her travel during multi-store shifts under the policy, she cannot maintain a claim for minimum wage violations for travel between job sites. With regard to work performed while traveling, however, it is possible that Johnson was not fully compensated for attending pre-inventory meetings and completing team leader tasks because they may have been performed during the two unpaid hours of commute time. In this instance, RGIS has failed to meet its burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Therefore, Johnson may proceed to trial with regard to her claim that she was not fully compensated at the minimum wage rate for activities performed en route to inventories that occurred after March 2004.

#### 4. *Overtime Violations*

As a separate matter, Johnson takes issue with RGIS's travel policy prior to March 2004 concerning its combination of travel pay and inventory pay to determine the "regular rate of pay" for purposes of calculating overtime compensation. RGIS urges the court to disregard this issue on the grounds that it was not raised in Johnson's First Amended Complaint and asserts that its methods complied with feder-

al law in any event. Upon review of the record, the court finds that it would be premature to determine the applicability of, and RGIS's compliance with, overtime requirements at this juncture. Indeed, there is no evidence in the record as to how overtime pay was actually calculated by RGIS, save a vague statement in RGIS's manuals, which was intended as a general guide to employees. Accordingly, the court concludes that it is inappropriate to dispose of this matter on summary judgment.

#### D. *Wait Time and Donning and Doffing Claims*

Johnson next asserts that she was not properly compensated for her wait time and the time she spent donning and doffing necessary equipment. She claims that her wait time includes time she spent: (1) arriving early at an inventory and waiting for the inventory to commence; (2) arriving early at the meet site and waiting for company transportation to depart; and (3) waiting for company transportation to leave a travel store after she had completed her inventory duties. RGIS responds that waiting and donning and doffing equipment were not integral and indispensable to Johnson's job as an auditor but were preliminary and postliminary to her principal activities within the Portal–to–Portal Act. It further argues that, even if these activities were principal in nature, the total time spent expended by Johnson on such work was *de minimis* as a matter of law.

#### 1. *Wait Time*

■ "The standard under the Portal–to–Portal Act for 'wait time' is the same as for 'travel time.' Wait time is compensable when it is part of a principal activity of the employee, but not if it is a preliminary or postliminary activity." *Vega*, 36 F.3d at 425. For example, normal checking in or

out and waiting in line to do so, changing clothes for the employee's convenience, washing up or showering, and waiting in line to receive paychecks are not principal activities. *Id.* (citing S. REP. No. 80–48, at 47 (1947)); *accord Alvarez,* 546 U.S. at 41, 126 S.Ct. 514; 29 C.F.R. § 790.7(g).

Ultimately, however, the facts of the particular case are controlling, as an activity that is preliminary or postliminary under one set of circumstances may be a principal activity under other conditions. *See id.* § 790.7(h); *see also Barrentine I,* 450 U.S. at 743, 101 S.Ct. 1437; *Blum v. Great Lakes Carbon Corp.,* 418 F.2d 283, 286 (5th Cir.1969), *cert. denied,* 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970) (citing *Mitchell,* 228 F.2d at 938); *Karr,* 950 F.Supp. at 1322. As explained in further detail in § 790.7:

> Waiting before the time established for the commencement of work would be regarded as a preliminary activity when the employee voluntarily arrives at his place of employment earlier than he is either required or expected to arrive. Where, however, an employee is required by his employer to report at a particular hour at his workbench or other place where he performs his principal activity, if the employee is there at that hour ready and willing to work but for some reason beyond his control there is no work for him to perform until some time has elapsed, waiting for work would be an integral part of the employee's principal activities. The difference in the two situations is that in the second the employee was engaged to wait while in the first the employee waited to be engaged.

29 C.F.R. § 790.7(h); *accord Alvarez,* 546 U.S. at 41, 126 S.Ct. 514; *Vega,* 36 F.3d at 425–26; *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1414 (5th Cir.1990); *see Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1189 (5th Cir.1989).

■ The Fifth Circuit has set forth two factors for determining whether wait time is compensable: (1) whether the wait predominantly benefits the employer and (2) whether the employee is able to use the time effectively for his or her own purposes. *Vega,* 36 F.3d at 425–26; *see Mireles,* 899 F.2d at 1411; *Halferty,* 864 F.2d at 1189; *Blum,* 418 F.2d at 284. Generally, "[w]aiting benefits the employer when it is requested or required by the employer." *Vega,* 36 F.3d at 425 (citing *Wirtz v. Sullivan,* 326 F.2d 946, 948 (5th Cir.1964)). Additionally, whether idle time is compensable does not depend on the reasonableness of the wait's duration. *Id.* at 426 (citing *Mireles,* 899 F.2d at 1413; *Halferty,* 864 F.2d at 1189).

### a. *Wait Time Incidental to RGIS Transportation*

Two of Johnson's claims for wait time are directly related to the company transportation she utilized when working at travel stores, namely, the time she spent waiting because she arrived fifteen minutes early at the meet site and the time she spent waiting for company transportation to depart from a travel store after she finished her inventory duties. As to wait time at the end of the day, Johnson testified that she waited off the clock only when Montgomery supervised the inventory, which Johnson estimated at twenty percent of the time. She stated that this wait time lasted an average of forty-five minutes. At deposition, Johnson acknowledged that she was free to run errands or get food while she waited and that she performed no work for RGIS after she was clocked out by Montgomery.

■ Under the specific facts of this case, the court finds that this type of wait time is noncompensable. As an initial matter, the use of the meet site and company transportation was, by Johnson's own

admission, optional. Thus, RGIS employees could forego waiting at the meet site entirely by choosing not to assemble there. Although Johnson claims that her supervisors required her to report to the meet site fifteen minutes prior to the scheduled meet time, it is evident that she was not "engaged to wait" as contemplated by the FLSA.

In particular, it is apparent that any requests made by RGIS for auditors to report early were intended to enable the company transportation to depart on time.[11] There is no evidence that RGIS disciplined auditors for not arriving at the meet site fifteen minutes early. While the court recognizes that auditors arriving early provided some benefit to RGIS in this regard, the wait time was not predominantly for RGIS's benefit because the transportation itself was primarily for the employees' convenience. Furthermore, this situation was not that of an employee being required to report early to his "workbench or other place where he performs his principal activity." 29 C.F.R. § 790.7(h). Rather, the meet site was one step removed from the place of Johnson's principal activities. As discussed above, Johnson did not perform any principal activities at the meet site but performed them at the inventory locations or, perhaps in some cases, in the RGIS van. Therefore, the court finds that, as a matter of law, Johnson was not entitled to compensation for any wait time stemming from her early arrival at the meet site.

■■■ With respect to wait time allegedly incurred by Johnson after an inventory was completed, the court reaches the same conclusion. Wait time that is "purely incidental to post-liminary transportation, rather than a principal activity" is not compensable. Dep't of Labor Opinion Letter WH–533 (Dec. 16, 1991), 1991 WL 790604; *accord Vega*, 36 F.3d at 426. For instance, if an employee is waiting to receive further instruction, perform additional work, or has otherwise not been relieved from duty, then the time is compensable. *See* Dep't of Labor Opinion Letter WH533. In contrast, when an employee is advised that there will be no other assignments and that she is free to use the time for her own purposes, and the employee in fact performs no other activities, then the wait is merely incidental to postliminary transportation and is not compensable. *See id.* The instant case is clearly akin to the latter scenario. On the few occasions when Johnson was signed out while waiting for company transportation to leave the store, she admits that she performed no additional work and was free to use the time to run errands or get food while she waited. Accordingly, the court finds that Johnson cannot pursue her claim for wait time that occurred after Johnson completed her inventory duties.

b. *Wait Time Prior to an Inventory*

■■■ Johnson also asserts that she should have been paid for time she spent waiting for an inventory to commence. Specifically, she alleges that she was required to arrive at least fifteen minutes early for each inventory and that, as a result, she was ready and willing to work but was unable to because she had to wait for equipment to be unloaded and the store to be prepared for the inventory. RGIS vigorously disputes that it required its auditors to report early to inventories. Construing all the evidence in the record in the light most favorable to Johnson, however, the court finds that she has raised a genuine issue of material fact as

---

11. As noted by Montgomery at deposition, auditors arriving late at the meet site was the primary reason for the van departing behind schedule. Indeed, Johnson was cited several times for tardiness over the course of her employment.

to whether she was required to report early to inventories, whether she did, in fact, arrive early, and whether she was "engaged to wait" by RGIS.

As to the first factor of the wait time analysis, if RGIS requested or required its auditors to arrive early at an inventory, then the wait time likely benefitted RGIS. *See Vega,* 36 F.3d at 425; *Sullivan,* 326 F.2d at 948. Indeed, having auditors arrive ahead of schedule would enable the team to start working as soon as the store was prepared for the inventory. Moreover, if Johnson was asked to report early to inventories—the place of the performance of her principal activities—and arrived at that time " ' "ready and willing to work" ' " but was unable to because she had to wait for RGIS to unload equipment or prepare the store, then she was " 'engaged to wait and is entitled to be paid for the time spent waiting.' " *Vega,* 36 F.3d at 425–26 (quoting *Mireles,* 899 F.2d at 1414 (quoting 29 C.F.R. § 790.7(h))). With regard to the second factor, the court likewise finds that there is a genuine issue of material fact as to whether Johnson could have used this wait time effectively for her own purposes, particularly due to the relatively short duration of the wait. *See id.* at 426; *Mireles,* 899 F.2d at 1414.

Furthermore, similar to the workers in *Vega,* Johnson has raised a genuine issue of material fact as to whether she was entitled to compensation for time she spent waiting for travel inventories to commence after the company van arrived at the inventory. *See Vega,* 36 F.3d at 426; *see also Vega v. Gasper,* 886 F.Supp. 1335, 1337 (W.D.Tex.1995) (holding that workers were "on duty" upon arrival at the chili pepper field because the wait benefitted the employer by allowing work to begin promptly at sunrise and workers could not use the time effectively for their own purposes). Therefore, the court concludes that summary judgment is not warranted

with respect to Johnson's claims for time spent waiting for inventories to commence.

2. *Donning and Doffing Equipment*

RGIS seeks summary judgment with respect to Johnson's donning and doffing claims on the grounds that these activities are preliminary or postliminary activities, which are noncompensable under the Portal-to-Portal Act. Johnson responds that donning and doffing inventory equipment is integral and indispensable to her job as an auditor and, thus, a principal activity for which she is owed compensation.

At the outset, the court finds that RGIS is entitled to judgment as a matter of law on Johnson's doffing claim. Although Johnson's Declaration of March 12, 2007, asserts that she was not paid to doff her equipment, such an allegation is directly contradicted by her prior sworn deposition testimony, in which she admitted that she was paid for all doffing time. "Conflicts between deposition testimony and subsequent affidavits or declarations are resolved in favor of the deposition testimony unless the conflict is explained." *Colindres v. QuietFlex Mfg.,* 427 F.Supp.2d 737, 746 (S.D.Tex.2006) (citing *Valleza v. City of Laredo,* 331 F.Supp.2d 579, 582–83 (S.D.Tex.2004) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir. 1996) ("[T]his court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."))); *accord Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223, 228 (5th Cir.1984). Because the conflict in this case is not explained, or even acknowledged, by Johnson in her response to RGIS's motion, her declaration is insufficient to defeat summary judgment on her doffing claim. *See id.*

In determining whether donning auditor equipment was integral and indispensable to Johnson's principal activities, the court considers whether "such work is necessary

to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business." *Dunlop,* 527 F.2d at 401; *accord Vega,* 36 F.3d at 424; *Karr,* 950 F.Supp. at 1322. "The only activities excluded from FLSA coverage [under the Portal–to–Portal Act] are those undertaken 'for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer.'" *Barrentine II,* 750 F.2d at 50 (quoting *Dunlop,* 527 F.2d at 398).

For example, the donning of common safety equipment, such as hard hats, ear plugs, rubber gloves, safety goggles, and similar items has been found strictly preliminary in nature, either because such activities were for the employee's benefit or because the donning process required so little concentration that it was not deemed to be "work." *See, e.g., Reich v. IBP, Inc.,* 38 F.3d 1123, 1125–26 (10th Cir.1994) (holding that donning safety glasses, a hard hat, and ear plugs was not "work"); *Pilgrim's Pride Corp.,* 147 F.Supp.2d at 561–63 (concluding that donning of a hairnet, ear plugs, rubber boots, gloves, apron, and smock was for the employee's benefit and was not "work"). In contrast, the donning of unique protective gear has been found compensable because it was so closely related to the performance of the principal activity that it was integral and indispensable to that activity. *See, e.g., Reich,* 38 F.3d at 1126 (concluding that knife-workers' donning of unique equipment was a principal activity where the equipment was cumbersome and required concentration to don securely and properly).

■ Upon examination of the facts and evidence presented in this case, the court concludes that Johnson has raised a genuine issue of material fact as to whether the donning of the equipment at issue was so integral and indispensable to her job as an auditor as to be a principal activity. Here, the relevant equipment included a belt and pouch, Audit Machine, laser gun and cable, inventory tags, and a writing utensil. While admittedly not as cumbersome as some work equipment, it is readily apparent that many of these items were unique to RGIS's business, required for the completion of Johnson's inventory duties, and not for Johnson's benefit or convenience. *See Barrentine II,* 750 F.2d at 50; *Dunlop,* 527 F.2d at 398. Moreover, it is not evident at this juncture that the donning process required so little exertion or concentration that the court can determine that it was not work within the meaning of the FLSA. *See Reich,* 38 F.3d at 1125 (defining work as "'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer'") (quoting *Tennessee Coal, Iron & R. Co.,* 321 U.S. at 598, 64 S.Ct. 698). Because genuine issues of material fact exist, the court rejects RGIS's request to dismiss Johnson's claims for donning her inventory equipment.

### 3. *De Minimis Doctrine*

■ As a final matter, RGIS contends that, even if waiting and donning equipment were viewed as principal activities, such time should nevertheless be disregarded as *de minimis.* Under the FLSA, employees are not entitled to compensation for theoretically compensable work when the time sought is negligible. *See Mt. Clemens Pottery Co.,* 328 U.S. at 692, 66 S.Ct. 1187; *Brock v. City of Cincinnati,* 236 F.3d 793, 804 (6th Cir.2001); *Pressley v. Sanderson Farms, Inc.,* No. Civ. A. H–00–420, 2001 WL 850017, at *3 (S.D.Tex. Apr. 23, 2001), *aff'd,* 33 Fed.Appx. 705 (5th Cir.2002). "As a general rule, employees cannot recover for otherwise compensable time if it is *de minimis.*" *Lindow,* 738

F.2d at 1062. The *de minimis* doctrine permits an employer, in recording work time, to "disregard 'insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes.'" *Mireles*, 899 F.2d at 1414 (quoting 29 C.F.R. § 785.47). The federal regulations also address this issue, stating as follows:

[I]nsubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (citation omitted); *accord Mireles*, 899 F.2d at 1414; *Pilgrim's Pride Corp.*, 147 F.Supp.2d at 564.

█ The following four factors are considered in determining whether an activity is *de minimis* as a matter of law: "(1) the amount of daily time spent on the additional work; (2) the administrative difficulty in recording the time; (3) the size of the aggregate claim; and (4) the regularity of the work." *Id.* (citing *Lindow*, 738 F.2d at 1062–63); *accord Brock*, 236 F.3d at 804. A review of reported decisions reveals that courts ordinarily consider daily periods of approximately ten minutes to be *de minimis* as a matter of law. *Lindow*, 738 F.2d at 1062; *see, e.g., E.I. du Pont de Nemours & Co. v. Harrup*, 227 F.2d 133, 135–

36 (4th Cir.1955); *Green v. Planters Nut & Chocolate Co.*, 177 F.2d 187, 188 (4th Cir.1949); *Pilgrim's Pride Corp.*, 147 F.Supp.2d at 564; *Pressley*, 2001 WL 850017, at *3.

█ In this instance, the court is unable to conclude that Johnson's wait time and donning time are *de minimis* as a matter of law. Although the circumstances present a close case, the factors under consideration weigh in Johnson's favor. First, with regard to the amount of time at issue, Johnson presents evidence that the time excluded from compensation for both waiting and donning equaled at least fifteen minutes. While courts have considered daily periods of up to ten minutes *de minimis* in several cases, the time at issue here exceeds that amount. *See, e.g., Kosakow*, 274 F.3d at 719 (finding that daily periods of fifteen minutes were not properly excluded as *de minimis*); *Reich*, 38 F.3d at 1126 (observing that as little as ten minutes of working time goes beyond the level of *de minimis*). Furthermore, the aggregate size of the claim and the regularity of the work also weigh in Johnson's favor. Although Johnson admits that she was paid for some of the time she spent waiting and donning equipment, the evidence is sufficient to show that, over a three-year period, she may have been denied a significant amount of compensation. Additionally, it is undisputed that donning equipment was an activity that had to occur before each inventory, and, construing the evidence in the light most favorable to Johnson, waiting time was also a typical occurrence.

█ Perhaps most importantly, however, RGIS fails to show that it was administratively impractical to record the time spent waiting and donning equipment. In particular, RGIS argues that it cannot practically record such time because it uses only one sign-in sheet, while in the same breath it asserts as a defense that

Johnson was, in fact, paid for such time. Indeed, Johnson stated at deposition that certain supervisors paid her for donning inventory equipment. Therefore, it is apparent that RGIS was not incapable of recording donning time or wait time. Because "[a]n employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him," the court cannot conclude here that Johnson's donning and wait time claims are *de minimis* as a matter of law. 29 C.F.R. § 785.47.

### III. *Conclusion*

For the foregoing reasons, RGIS's Motion for Summary Judgment is granted in part and denied in part. Specifically, with respect to travel time, the court finds that Johnson's claims for minimum wage violations that occurred prior to March 2004 fail as a matter of law. Johnson may, however, proceed on her claim for travel time that relates to work she allegedly performed en route to inventories after March 2004. As to wait time, RGIS is entitled to judgment as a matter of law with respect to waits that were purely incidental to company transportation. Summary judgment is denied as to Johnson's remaining claims for wait time. With regard to Johnson's donning and doffing claims, the court concludes that RGIS is entitled to judgment as a matter of law on Johnson's doffing claim but that genuine issues of material fact preclude summary judgement with respect to her donning claim. Finally, genuine issues of material fact preclude summary judgment in RGIS's favor as to Johnson's claims for overtime compensation.